# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| LINDA TEARE, | ) | CASE NO. 1:10-cv-01711 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| INDEPENDENCE LOCAL SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| *et al.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | | |

## I. Procedural Background

On August 4, 2010, Plaintiff Linda Teare ("Teare"), a former student at Independence

Middle School, filed a Complaint (ECF No. 1) alleging four causes of action against Defendants

Independence Local School District Board of Education (the "School Board"), the

Superintendent, Daniel Laurenzi ("Laurenzi"), and teacher Jill Wagner ("Wagner").

Specifically, Teare alleges the following causes of action: (1) a violation of her First Amendment

rights to free speech, including her right not to speak, against all Defendants; (2) a violation of

her rights of familial association as guaranteed by the Fourteenth Amendment against all

Defendants; (3) a deprivation of her constitutional rights resulting in severe emotional distress

due to the School Board's policies; and, (4) intentional infliction of emotional distress against

Defendant Wagner.[1] (ECF No. 1.) On November 30, 2010, Defendant Wagner also filed her

---

[1] On January 31, 2011, Defendants Laurenzi and the School Board filed a Motion for
Judgment on the Pleadings with respect to Counts One through Three of the Complaint.
(ECF No. 15.) Teare filed a responsive brief on March 2, 2011. (ECF No. 17), to which
Defendants filed a Reply. (ECF No. 18.) In a Report and Recommendation issued on
August 18, 2011, this Court recommended that Teare's causes of action against

Answer.  (ECF No. 6.)

On April 21, 2011, Defendant Wagner filed a Motion for Summary Judgment.  (ECF No. 21.)  On June 3, 2011, Teare filed a responsive brief.  (ECF No. 28.)  On June 16, 2010, Defendant Wagner filed her Reply.  (ECF No. 29.)

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c)(2) governs summary judgment motions and states:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Rule 56(e) specifies the materials that may be submitted in connection with a motion for summary judgment:

> (1) **In General**.  A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

> (2) **Opposing Party's Obligation to Respond.**  When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must– by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

In considering summary judgment motions, this Court must view the evidence in a light

---

Defendants Laurenzi and the School Board be dismissed.  (ECF No. 30.)

most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact.  *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Id*.  "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery."  *Liberty Lobby*, 477 U.S. at 257.

In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007).  Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

3

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### III.  Summary of Facts[2]

In August of 2004, Teare was a thirteen year-old student entering the eighth grade at Independence Middle School.  (Compl. ¶¶11, 14; Pl.'s Depo. at 39.)  Around that time, the Independence School Board announced it was placing a tax levy on the November 2004 ballot. (Compl. ¶14.)

According to Mrs. Teare, during a school open house held on September 2, 2004, she was approached by Wagner, who stated that she was upset that Mrs. Teare's brother-in-law, David Teare, published Wagner's salary during the course of a previous school levy campaign.[3]  (Mrs. Teare's Depo. at 40, 61-62.)  Teare did not witness the conversation.  *Id.*  Wagner was Teare's English, Reading, and Homeroom teacher.  (Pl.'s Depo. at 46.)  According to Teare, Wagner began speaking about the importance of the school levy passing on the very first day of school, but did not single her out in class that day.  (Pl.'s Depo. at 45.)  Teare stated that Wagner made some comment about the school levy in each of those classes at least four times a week.  (Pl.'s Depo. at 46.)  Teare stated that Wagner's discussions of the levy could be as short as one sentence or take up the entire class.  *Id.*  Conversely, Wagner stated that she only spoke about

---

[2]  These facts are derived from the depositions of Plaintiff Linda Teare (hereinafter "Pl.'s Depo.), Janet Teare (hereinafter "Mrs. Teare's Depo.), and Defendant Jill Wagner (hereinafter Def.'s Depo.)  (ECF Nos. 23, 24, and 25.)

[3]  Teare's uncle, David Teare, was a leader of a local group called Citizens for District Change that opposed passage of the school levy.  (Compl. ¶15; Pl.'s Depo. at 41-44.)

4

the levy on three to five occasions in response to questions asked by students.[4] (Def.'s Depo. at 14, 17-18, 20-21.)

Teare and her parents, initially, were in favor of the school levy's passage. (Pl.'s Depo. at 39-41; Mrs. Teare's Depo. at 38-39.) Both she and her parents voiced their position to school teachers and staff. (Pl.'s Depo. at 39-41; Mrs. Teare's Depo. at 39.) Teare also told other students that she and her parents supported the levy, though she contends the students did not believe her. (Pl.'s Depo. at 52.) Teare and her mother assert that Teare, nonetheless, was retaliated against for the anti-levy views expressed by her uncle. (Pl.'s Depo. at 42-43; Mrs. Teare's Depo. at 108.) Teare contends that on a number of occasions when Wagner was discussing the levy, she remarked how it was incomprehensible that people with family members in the school district could be opposed to the levy, followed by the statement "Sorry, Linda." (Pl.'s Depo. at 47-49.) On one occasion, Wagner suggested that maybe the students should pledge allegiance to the levy as she snickered. (Pl.'s Depo. at 81-82.) However, nobody was actually required to pledge allegiance to the levy, and, in fact, no student did so. *Id.*

Teare stated that there were also four occasions when she had discussions outside of the classroom with Wagner. (Pl.'s Depo. at 52.) One of those occasions was ostensibly unrelated to the levy. The conversation concerned Wagner's suspicion or concern that Teare and another student, Emily Varga, may have been copying from one another's school work. (Pl.'s Depo. at

---

[4] Wagner also asserts that after Teare complained to the administration about the levy questions that arose in class, she was instructed not to discuss the levy anymore. (Def.'s Depo. at 20, 25.) This occurred the same day that Teare asked Wagner to return to instructing the class in English and grammar. *Id.* at 22. After that, Wagner asserted that she did not answer any more questions concerning the levy. *Id.* at 61. Wagner does not recall having any other discussions with Teare concerning the school levy. *Id.* at 22-23.

57-61; *see also* Def.'s Depo. at 30-33.)

Teare also identified three hallway conversations that were related to the levy.  In one, Wagner allegedly asked Teare to inform her before her uncle published any more anti-levy literature.  (Pl.'s Depo. at 61-62.)  Wagner then snickered, and said Teare should just disassociate from her family.  *Id.*  A second hallway conversation revolved around a writing assignment Teare prepared for class, the content of which stated that her uncle, David Teare, was her hero for speaking his mind regarding the school levy.  (Pl.'s Depo. at 63-64.)  Wagner told Teare that she believed the essay was insulting, as it allegedly stated that Teare was more mature than her teacher.  (Def.'s Depo. at 48; *see also* Pl.'s Depo. at 64.)  The essay prompted a meeting between Teare's mother, Wagner, and the school principal.  *Id.* at 48-57.  Teare stated that the essay was never returned to her, and she received a zero on the assignment.  (Pl.'s Depo. at 64-65.)  Wagner avers that the essay in question was an ungraded practice assignment. (Def.'s Depo. at 23-24.)

The fourth alleged hallway conversation occurred after the school levy failed.  (Pl.'s Depo. at 66.)  According to Teare: "Wagner was obviously upset and very distressed, and she took me into the hallway and she said, you know, Linda, I hope you and your family and your uncle are proud of what they did.  And because the levy failed, your family is going to hang in the front yard as the city cheers as your bodies burn."  (Pl.'s Depo. at 66-67.)

## IV.  Law and Analysis

To prove a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the Constitution or laws of the United States, and the deprivation of that right by a person acting

under color of state law.  *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  Counts One

and Two allege deprivations of Teare's constitutional rights.[5]  Count Four is based on Ohio law.

**A.    Claims Against Wagner in Her Official Capacity**

The Complaint names Wagner as a defendant in both her personal and official capacities.

Wagner asserts that a suit against a person acting in his or her official capacity as a public

official is merely a suit against the government entity itself.  (ECF No. 21-1 at 5.)  Indeed, "[a]

suit against an individual 'in his official capacity' has been held to be essentially a suit directly

against the local government unit."  *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th

Cir. 1989).  In her response, Teare "agrees with defendant's analysis that the official capacity

claim against Wagner is the equivalent to naming the School Board ..."  (ECF No. 28.)

Therefore, any claim against Wagner in her *official* capacity is construed as a cause of action

against the School Board itself, which Teare has named as a defendant.  In a separate Report,

this Court recommended that the claims against the School Board be dismissed.  (ECF No. 30.)

Because Teare's causes of action against Defendant School Board cannot withstand Defendants'

motion for judgment on the pleadings, her causes of action against Wagner in her *official*

capacity also should be dismissed.

**B.    Civil Rights Claims Against Wagner in Her Personal Capacity**

**1.  First Amendment Free Speech Violation**

In Count One of the Complaint, Teare alleges that her constitutional right to free speech

---

[5]  Count Three is asserted only against Defendant School Board and need not be
discussed herein.  (ECF No. 1.)

under the First Amendment, including her right not to be compelled to speak, was violated by all Defendants, including Wagner. (ECF No. 1.)

Wagner asserts that the civil rights actions against her in her *personal* capacity should be dismissed because she is entitled to qualified immunity, "which shields government officials from personal liability 'for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009) (*citing Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

> The issue of qualified immunity is essentially a legal question for the court to resolve. *Elder v. Holloway*, 510 U.S. 510, 516, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994); *Tucker v. City of Richmond*, 388 F.3d 216, 219 (6th Cir. 2004). "In determining whether qualified immunity applies, [the court] employ[s] a two-part test, asking (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008).

*Everson*, 556 F.3d at 494. Once a defendant raises qualified immunity as a defense, it is the plaintiff who bears the burden of demonstrating that a defendant is not entitled to qualified immunity by showing that a right is clearly established. *Id*. (*citing Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006); *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004)).

In addition, Wagner asserts she is entitled to summary judgment because there are no facts of record that support Teare's First Amendment claim. (ECF No. 21-1 at 5-8.) In order to establish a *prima facie* case of unconstitutional retaliation under the First Amendment, "a plaintiff must demonstrate (1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill

8

a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights."  *Goad v. Mitchell*, 297 F.3d 497, 500 (6th Cir. 2002) (*quoting Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 345 (6th Cir. 2001)); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  Wagner contends that Teare was not engaged in any constitutionally protected activity because: (1) she was not exercising any free speech rights; and, (2) she was not compelled to engage in any speech against her will.  (ECF No. 21-1 at 5-7.)

In Count One, Teare alleged that *her* "rights to free speech, including the right not to speak or express an opinion about the school levy," were violated by Wagner.  (ECF No. 1 at ¶35.) Teare can point to no set of facts indicating that she was retaliated against because she spoke out against the school levy.  To the contrary, Teare specifically stated that she, like Wagner, was for the school levy, and that she told teachers and other students that she and her parents were in favor of the levy.[6]  (Pl.'s Depo. at 39-41, 52.)  Teare has also not identified any facts that could reasonably support the inference that she was compelled to speak out in favor of the school levy. On one occasion, it is alleged that Wagner suggested, in what appears based on Teare's testimony to be a light-hearted manner, that students should pledge allegiance to the school levy. (Pl.'s Depo. at 81-82.)  Teare acknowledges that nobody actually pledged allegiance to the levy

---

[6]  Teare stated that she did not think that the other students believed her and that she did not directly tell Wagner that she was in favor of the levy.  (Pl.'s Depo. at 52-53.) However, Teare has not asserted that her First Amendment right was violated because she was retaliated against for being perceived, rightly or wrongly, to be against the school levy.  Furthermore, unless there is a clearly established right to be free from retaliation for being *perceived* to hold a certain political position, Wagner would be entitled to qualified immunity.  Teare, who bears the burden of showing that Wagner is not entitled to qualified immunity, has not identified such a right.

9

on this or any other occasion. *Id*. Therefore, it cannot be reasonably argued that this alleged incident resulted in a form of compulsory speech. *Id*. As such, there are no facts to support the first element of a *prima facie* case of unconstitutional retaliation under the First Amendment with respect to a claim that Teare's First Amendment rights were violated.

Nonetheless, Teare argues that Wagner ignores the law concerning "derivative First Amendment" claims. (ECF No. 28 at 9-16.) In support, Teare cites case law from the United States District Court for the Southern District of New York. *Id*. Though not binding on this Court, these cases rely on the United States Supreme Court's decision in *Singleton v. Wulff*, 428 U.S. 106 (1976). The *Singleton* decision observed that:

> Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. *See Ashwander v. TVA*, 297 U.S. 288, 345-348 (1936) (Brandeis, J., concurring) (offering the standing requirement as one means by which courts avoid unnecessary constitutional adjudications). Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them. The holders of the rights may have a like preference, to the extent they will be bound by the courts' decisions under the doctrine of *stare decisis*. *See, e.g., Baker v. Carr*, 369 U.S. 186, 204 (1962) (standing requirement aimed at "[assuring] that concrete adverseness which sharpens the presentation of the issues upon which the court so largely depends"); *Holden v. Hardy*, 169 U.S. 366, 397 (1898) (assertion of third parties' rights would come with "greater cogency" from the third parties themselves). These two considerations underlie the Court's general rule: "Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S., at 255. *See also Flast v. Cohen*, 392 U.S., at 99 n. 20; *McGowan v. Maryland*, 366 U.S. 420, 429 (1961).

*Singleton*, 428 U.S. at 113-114. Teare concedes that she "may not have expressed an opinion on the levy," but argues that she was retaliated against for her uncle's speech. Thus, it was not

Teare, but her uncle who was exercising his First Amendment rights, and, as a general rule, Teare does not have standing to vindicate the third-party rights of her uncle.

Nevertheless, the Supreme Court has "not treated this rule as absolute, ... recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-130 (2004).  The exception to the rule is limited to situations where the party seeking third-party standing can make two additional showings: (1) the plaintiff asserting the right has a "close" relationship with the third party who possesses the right; and, (2) whether there is a "hindrance" to the third party's ability to protect his own interests.  *Id.* (*citing Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  Within the context of the First Amendment cases, such as this one, the Supreme Court has observed that other concerns "justify a lessening of prudential limitations on standing." *Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

This Court cannot find that Teare's relationship with her uncle is insufficiently close to bar her assertion of third-party standing. *See, e.g., Smith v. Jefferson County Bd. of Sch. Comm'rs*, 641 F.3d 197, 208 (6th Cir. 2011) ("teachers may have a sufficiently close relationship to their students to satisfy the first prong of the test for third-party standing").  As has been noted by another Circuit Court, the close relationship "requirement is not formidable." *United States v. $100,348.00 in United States Currency*, 354 F.3d 1110, 1128 (9th Cir. 2004) (*citing Craig v. Boren*, 429 U.S. 190, 194 (1976) (permitting a liquor-store operator to assert the Equal Protection rights of her underage male patrons) (Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.9 nn.63-69 (2d ed. 1984 & Supp. 2003) (listing constitutionally adequate close relationships as including vendor-client, physician-patient, attorney-client,

11

employee-employer, electoral candidate--voter, school board--student)).

Teare further argues that there is a hindrance to the third party's ability to protect his own interests, namely that her uncle cannot sue because he has suffered no damages.  (ECF No. 28 at 12.)  Wagner had no means to retaliate against Teare's uncle directly.  *Id*.  Neither party has cited binding precedent that is factually similar to the instant matter.[7]  Nonetheless, a public official is *not* entitled to qualified immunity simply because her precise behavior has not been found to be in violation of the Constitution or federal law in the past.  It is only the "contours of the right [which] must be sufficiently clear that a reasonable official would understand" that her behavior violates the right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Id*. (citations omitted).

It is apparent from clearly established law that a public official or employee, such as Wagner, may not retaliate against an individual for engaging in constitutionally protected activity, such as the exercise of free expression, where such retaliation was motivated, in part, by the exercise of that right and where the retaliation would likely chill a person of ordinary

---

[7] Although the law cited by Teare is not binding, it is persuasive.  In *Camacho v. Brandon*, 69 F. Supp. 2d 546, 551 at n. 5 (S.D.N.Y. 1999), the court rejected the argument that third-party standing was inappropriate because the third party, Fuentes, was not sufficiently injured.  The *Camacho* court reasoned that plaintiff was fired in retaliation for Fuentes exercising his free speech rights.  *Id*.  It was the plaintiff who was fired, not for his own speech, but for Fuentes's speech.  *Id*.  However, the lack of any tangible economic loss to Fuentes made it unlikely that he would bring suit, rendering the facts "a classic situation for third-party standing."  *Id*.  This case is quite similar in the sense that it was Teare's uncle who exercised his First Amendment rights, but Teare who allegedly suffered retaliation.

firmness from continuing to engage in that activity.  It was further clearly established that third party standing suits may be brought by individuals who share a close relationship to the third party whose ability to pursue the case on his or her own is hindered.  The Supreme Court has noted that in First Amendment cases, the third-party standing standard should be more relaxed.  *See, e.g., Sec'y of Maryland*, 467 U.S. at 956-57 ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.") (citations omitted).  Although the instant case does not involve the challenge of a statute, it is entirely foreseeable that retaliation against a minor child could very well chill the speech of a close family member.  As such, Count One should not be dismissed on the grounds that Wagner enjoys qualified immunity.[8]

This, however, does not end the analysis.  The Court must continue its inquiry as to whether the facts, construed in a light most favorable to Teare, are capable of demonstrating a *prima facie* case of unconstitutional retaliation under the First Amendment.  Wagner avers that there was no adverse action against Teare, and that the alleged verbal harassment and/or threats are insufficient.  (ECF No. 29 at 5-6.)  Adverse action has been defined as follows:

> "An adverse action is an action 'that would deter a person or ordinary firmness from the exercise of the right at stake.'"  *Mills*, 476 F. Supp. 2d at 661 (*quoting*

---

[8]  Wagner also argues that the Complaint does not expressly raise a derivative third party First Amendment claim, as Count One alleges a violation of only Teare's rights under the First and Fourteenth Amendment.  (ECF No. 29 at 3-4.)  While Teare's Complaint may not be particularly precise on this point, reading the factual allegations as a whole, it is clear that the primary thrust of the Complaint is that Defendants retaliated against Teare due to her uncle's speech.  Therefore, the Court finds this argument to be without merit.

> *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6ᵗʰ Cir. 1999) (*en banc*).  In the
> context of a First Amendment retaliation claim, the court examines "whether an
> official's acts would chill or silence a person of ordinary firmness from future
> First Amendment activities."  *Thaddeus X*, 175 F.3d at 397 (internal quotation
> marks and citations omitted).  "Although several courts have cited dicta in *Rutan
> v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8, 110 S. Ct. 2729, 111 L. Ed.
> 2d 52 (1990), for the proposition that 'even an act of retaliation as trivial as
> failing to hold a birthday party for a public employee . . . when intended to punish
> her for exercising her free speech rights' is sufficient to find an adverse action,
> the Sixth Circuit has explicitly rejected this dicta."  *Mills*, 476 F. Supp. 2d at 661
> n.8 (quoting *Thaddeus X*, 175 F.3d at 397-98).  Moreover, "[p]urely personal
> reasons for preferring a former state of affairs over the current state of affairs are
> insufficient to make a change an adverse action."  *Id*. at 661-62 (citations
> omitted).  Likewise, "[c]riticisms, accusations, threats, or bad mouthing are not
> enough."  *Id*. at 662 (internal quotation marks and citations omitted).

*Dye v. Office of Racing Comm'n*, 2011 U.S. Dist. LEXIS 57628, 43-44 (E.D. Mich. May 31,

2011).

Here, there are a number of actions that could be construed as adverse, either singularly or

in combination.  First, Teare alleges that she was given zero credit on a school assignment

because she identified her uncle – the same uncle who opposed the school levy – as her hero for

speaking his mind and standing firm in his convictions.  (Pl.'s Depo. at 63-65.)  The essay also

prompted a meeting between Teare's mother, Wagner, and the principal.  Although Wagner

stated that this assignment was ungraded and that the controversy surrounding the essay was its

alleged disrespectful tone (Def.'s Depo. at 23-24.), the facts at the summary judgment stage

must be construed in Teare's favor.  In her deposition, Teare indicated that she does not believe

that the essay implied that she was more mature than Wagner.  (Pl.'s Depo. at 64.)  The essay is

not part of the factual record before this Court, nor can the Court verify whether the assignment

negatively impacted Teare's grades, as she alleges.  Thus, Teare may have suffered some

adverse action.

Second, Wagner's alleged statement that Teare and her family would hang in the yard as their bodies burned could also satisfy the adverse action requirement. As stated above, "Mere threats . . . are generally not sufficient to satisfy the adverse action requirement." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). However, "[t]his is not a hard and fast rule, as there are no doubt stand-alone threats that would deter a person of ordinary firmness from exercising their protected rights. We do not apply the adverse action inquiry mechanically, as 'each step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made.'" *Hornbeak-Denton v. Myers*, 361 Fed. Appx. 684, 689 (6th Cir. 2010) (*quoting Thaddeus-X*, 175 F.3d at 395.) Given the flexible nature of the analysis, the Court cannot find that Wagner's alleged statement – that Teare's family would hang in its front yard while their bodies burned – is insufficient to chill the protected speech of a person of ordinary firmness.[9] In *Hornbeak,* the Sixth Circuit Court of Appeals found the threat of legal action insufficient. *Id.* Nonetheless, the threat of taking some adverse action, such as might occur where an employer threatens to terminate or discipline an employee for engaging in protected conduct, is categorically different than a threat to the safety of one's family as alleged herein. Therefore, Wagner's "threat" satisfies the adverse action requirement as it could

---

[9] It is unclear whether Wagner's statement was an actual threat to the safety of Teare and her family, or whether it was an attempt to intimidate born of frustration. At this stage of the proceedings, the Court must accept that the statement was made. Furthermore, it is immaterial whether Teare's uncle was aware of this statement, as the test is an objective one – whether a person of ordinary firmness would be deterred from engaging in a protected conducted – and not a subjective one. *See, e.g., Clark v. Corr. Corp. of Am.*, 98 Fed. Appx. 413, 415 (6th Cir. 2004) (finding that an inmate's § 1983 claim did not fail because he continued to file grievances even after he was placed into segregation for filing the initial grievance). The *Clark* court explained that "just because Clark, a person of possibly extraordinary firmness," was not deterred did not mean that a person of ordinary firmness could not be deterred by punitive segregation. *Id.*

15

reasonably deter a person or ordinary firmness from exercising his or her First Amendment rights, especially where the threat was made to a thirteen-year-old girl by her school teacher.

Finally, given Wagner's pro-levy stance and her repeated speech in favor of the levy, it cannot credibly be denied, for the purposes of this motion, that her actions against Teare were, at least in part, motivated by the opposition of David Teare to the school levy.

For the foregoing reasons, it is recommended that Wagner's motion for summary judgment with respect to Count One be denied.

### 2. Fourteenth Amendment Familial Association Claim

Teare avers that Wagner, along with all the other Defendants, violated her right of familial association as guaranteed by the Fourteenth Amendment when she was retaliated against due to her uncle's opposition to the school levy.  (ECF No. 1 at ¶¶37-39.)

Wagner again claims that she is entitled to qualified immunity.  (ECF Nos. 21-1 & 29 at 10-12.)  She argues that she has not violated any clearly established statutory or constitutional rights a reasonable person would have known about.  *Id*.  Wagner further maintains that Teare's relationship with her uncle is not protected by the right to familial association, as familial association only attaches to a family member outside of the immediate family when such family member resides with the child or acts in a parental capacity to that child.  (ECF No. 21-1 at 8.) Teare bears the burden of demonstrating that Wagner is not entitled to qualified immunity by showing that her right to familial association with her uncle under the Fourteenth Amendment was clearly established.  *Everson*, 556 F.3d at 494.

Teare has failed to show that she had a clearly established right.  In her response to Wagner's motion for summary judgment, Teare fails to cite any binding authority from the

United States Supreme Court or the Sixth Circuit Court of Appeals suggesting that she has a

right to familial association with her uncle.  (ECF No. 28 at 16-19.)  Teare's citation to a Tenth

Circuit Court of Appeals' decision is unavailing, as that case merely discusses that there are two

types of associational rights.  *Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir. 1993); *see also*

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984) ("Our decisions have referred to

constitutionally protected "freedom of association" in two distinct senses.  In one line of

decisions, the Court has concluded that choices to enter into and maintain certain intimate

human relationships must be secured against undue intrusion by the State because of the role of

such relationships in safeguarding the individual freedom that is central to our constitutional

scheme....  In another set of decisions, the Court has recognized a right to associate for the

purpose of engaging in those activities protected by the First Amendment -- speech, assembly,

petition for the redress of grievances, and the exercise of religion.")

    Neither *Griffin* nor *Roberts* stand for the proposition that there is a familial right of

association with an uncle, aunt, or any other non-immediate member of one's family.[10]  Though

---

[10]  In her response, Teare asks that the Court grant her leave to amend the Complaint to
add a First Amendment "familial association" claim.  (ECF No. 28 at 18.)  This Court,
however, will not issue a *sua sponte* order without an actual motion filed on the docket.
Furthermore, the Supreme Court's decision in *Roberts* did not find that the right to
associate for the purpose of engaging in First Amendment was in any way related to
*familial* association.  As such, Teare has not identified any clearly established law
suggesting the existence of a "First Amendment familial association claim."  Teare even
concedes that this issue "has not been totally resolved by the U.S. Supreme Court and the
Sixth Circuit."  *Id*.  Thus, it cannot reasonably be argued that Teare had a clearly
established right to such familial association of which a reasonable person would have
known. Therefore, amending the Complaint would be futile.  "[I]t is well settled law that
[a] district court may deny a motion to amend if the court concludes that the pleading as
amended could not withstand a motion to dismiss."  *Martin v. Assoc. Truck Lines, Inc.*,
801 F.2d 246, 248 (6th Cir. 1986) (*citing Neighborhood Dev. Corp. v. Advisory Council
on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980)); *see also Rose v. Hartford*

17

a district court in California allowed a plaintiff to maintain a First Amendment right of familial association claim, the facts of that case are inapposite.  *Torre v. City of Salinas*, 2010 U.S. Dist. LEXIS 97725 (N.D. Cal. Sept. 17, 2010) (parents sued a municipal defendant for the death of their epileptic daughter after police officers shot and tasered her).

Teare has not established that she had a clearly established right of familial association with her uncle, regardless of whether that claim is made under the First or Fourteenth Amendment.  Therefore, it is recommended that Count Two against Wagner in her personal capacity be dismissed with prejudice.

**C.    Ohio Tort Claim Against Wagner in Her Personal Capacity**

Count Four of the Complaint asserts a cause of action against Wagner for intentional infliction of emotional distress.  (ECF No. 1.)

In order to establish a claim for the intentional or reckless infliction of emotional distress (hereinafter "IIED"), a plaintiff must show: (1) that the defendant intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) that the defendant's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it must be considered as utterly intolerable in a civilized community; (3) that the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.  *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (Ohio 1983).  The term "serious" refers to an emotional injury

---

*Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).  In other words, where the amendment would be futile, there is no reason to allow it.  *See, e.g., Frank v. Dana Corp.*, 2009 U.S. Dist. LEXIS 77030 at *43 (N.D. Ohio Aug. 25, 2009).

18

which is both severe and debilitating, such that a reasonable person would be unable to cope

adequately with the mental distress engendered by the circumstances.  *Paugh v. Hanks*, 6 Ohio

St.3d 72, 78, 451 N.E.2d 759 (Ohio 1983).

Wagner argues that she is immune to such an action pursuant to Ohio Revised Code

("O.R.C.") § 2744.03(A)(6), which reads, in pertinent part, as follows:

> (A)  In a civil action brought against a political subdivision or an employee of a
> political subdivision to recover damages for injury, death, or loss to person or
> property allegedly caused by any act or omission in connection with a
> governmental or proprietary function, the following defenses or immunities may
> be asserted to establish nonliability:

> ***

> (6)  In addition to any immunity or defense referred to in division (A)(7) of this
> section and in circumstances not covered by that division or sections 3314.07 and
> 3746.24 of the Revised Code, the employee is immune from liability unless one
> of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the
> employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad
> faith, or in a wanton or reckless manner;

> (c) Civil liability is expressly imposed upon the employee by a section of the
> Revised Code. Civil liability shall not be construed to exist under another section
> of the Revised Code merely because that section imposes a responsibility or
> mandatory duty upon an employee, because that section provides for a criminal
> penalty, because of a general authorization in that section that an employee may
> sue and be sued, or because the section uses the term "shall" in a provision
> pertaining to an employee.

Teare does not dispute that O.R.C. § 2744.03(A)(6) confers immunity on state employees,

but challenges Wagner's analysis.  (ECF No. 28 at 20-21.)  Teare also appears to concede that

liability is not imposed by another section of the Ohio Revised Code and that Wagner's actions

19

were not manifestly outside the scope of her employment or official responsibilities.  *Id*.

Nonetheless, Teare argues that there is evidence to support that Wagner acted maliciously, with bad faith, and/or recklessly.  *Id*.  This Court agrees.  According to Teare's deposition testimony, Wagner stated that "I hope you and your family and your uncle are proud of what they did.  And because the levy failed, your family is going to hang from in the front yard as the city cheers as your bodies burn."  (Pl.'s Depo. at 66-67.)  These comments, especially made by a teacher to one of her thirteen-year-old students, could be construed as an act done with malicious purpose or in a wanton manner.  Wagner asserts that she does not recall this conversation and that Teare did not report her statement to anyone else.  (ECF No. 21-1 at 14-15.)  First, Wagner's contention that Teare did not report this incident is inconsistent with Teare's deposition, in which she indicated that she told principal Vittardi about the threatening language as well as her mother.  (Pl.'s Depo. at 71-71.)  Second, at the summary judgment stage, the Court construes the evidence in the light most favorable to the non-moving party and does not make its own credibility determinations.  Therefore, Wagner's assertion that she does not recall making such a statement does not allow the Court to ignore Teare's deposition testimony.  As such, Wagner is not entitled to statutory immunity.

The question remains, however, whether there is evidence of record that could allow Teare to maintain her IIED claim.  Wagner's alleged statement, regardless of whether she actually intended to carry out a violent act, is sufficient to show that she intended to cause emotional distress.  Furthermore, a jury could reasonably find that such a statement, especially made to a thirteen year old girl, was so extreme and outrageous as to go beyond all possible bounds of decency.  As to the third and fourth elements of a cause fo action for IIED, while there is not

much in the way of medical evidence regarding whether Wagner's threatening statements caused a psychic injury or mental anguish of a serious nature, Teare did testify that she was treated by a sports psychologist for stress that caused her to suffer a dislocated shoulder on an almost daily basis.  (Pl.'s Depo. at 88-89.)  She also testified that she was prescribed Zoloft, an anti-depressant, for three out of her four years of high school and still has nightmares about the statement Wagner made to her.  *Id.* at 105, 113.  Teare's mother testified that Teare also developed severe migraines and Temporomandibular Joint Disorder ("TMJ") when these events occurred.  (Teare Depo. at 126-27.)  Finally, Wagner did not argue that summary judgment should be granted on Teare's IIED claim because there is insufficient evidence to support a serious psychic injury.  Therefore, it is recommended that Wagner's motion for summary judgment be denied with respect to Count Four of the Complaint.

### V.  Conclusion

It is recommended that Defendant Wagner's Motion for Summary Judgment be GRANTED in part and DENIED in part.  Specifically, Count Two should be dismissed with prejudice, while the plaintiff should be allowed to proceed with Counts One and Four against Defendant Wagner.

/s/ Greg White
U.S. Magistrate Judge

Date: August 31, 2011

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*,**

638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).